People v Zuhdi A. (2025 NY Slip Op 51047(U))

[*1]

People v Zuhdi A.

2025 NY Slip Op 51047(U)

Decided on June 17, 2025

Criminal Court Of The City Of New York, New York County

Morales, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 17, 2025
Criminal Court of the City of New York, New York County

The People of the State of New York,

against
Zuhdi A., Defendant.

Index No. CR-017044-24NY

Shane Ferro, Esq., Legal Aid Society, for the defendant
ADA Ryan Falk for the People

Valentina M. Morales, J.

There can be no dispute that in our increasingly digital and digitized world, information technology is constantly defining and redefining daily life. People carry in their palms more than any house could ever hold, while in many spaces, vast surveillance systems track every step from angles we might never have imagined. Artificial intelligence is designed to comb through immeasurable data to match faces and features, which can be altered, entirely transformed, or completely fabricated. As events zip by at a ferocious speed, the criminal legal system finds itself both catching up and slowing down — curbing the pace so that fair process can be preserved and careful justice achieved. Where the state routinely gathers, searches, seizes, and preserves colossal amounts of information, transparency must remain a touchstone, lest fairness be lost.
In the instant case, law enforcement officials extracted still images from video surveillance; employed unauthorized facial recognition technology software to identify a suspect; inappropriately accessed a DMV database to retrieve the suspect's photograph; technologically altered the physical features depicted therein; and finally placed the changed photograph in an array for identification. Having ruled from the bench on the validity of the People's certificates of compliance, this court would not typically set forth its reasoning in extensive written detail; but this case has uncovered practices and issues that were surprising to this court. The details are [*2]offered to give a sense of the questions and challenges facing criminal courts during an age in which the state collects an unprecedented amount information, using tools most practitioners do not entirely understand — an age in which information that used to take weeks to retrieve can be accessed at the push of a button.
Zuhdi A., hereinafter "defendant," is charged by information with one count of Aggravated Harassment in the Second Degree (Penal Law § 240.30 [3]), a class A misdemeanor. Currently before this court are a series of motions, including the defendant's motions to dismiss on three separate grounds, and the People's motion seeking a ruling that their initial November 14, 2024 Certificate of Compliance (COC) and Certificate of Readiness (COR) be deemed proper and valid notwithstanding this court's prior invalidation of the same. Defendant asserts the following grounds for dismissal: 1) the accusatory instrument is facially insufficient for failure to establish an essential element (CPL 100.40, 170.30 [1] [a], 170.35 [1] [a]); 2) the accusatory instrument is facially insufficient under separate constitutional grounds, specifically that the statute is impermissibly vague as applied in this case (CPL 170.30, 170.35 [1] [c]); and 3) the People have deprived him of his due process right to a speedy trial (CPL 30.30, 170.30 [1] [e]). For the reasons articulated herein, defendant's motion to dismiss on speedy trial grounds is GRANTED, and the People's motion for their initial COC and COR to be deemed valid is DENIED. Defendant's additional motions by omnibus, including facial sufficiency claims, are therefore moot.
Procedural History
The charged incident took place on April 20, 2024. The defendant was identified in early June 2024 using facial recognition technology software licensed to the FDNY and operated by a fire marshal. On June 13, 2024, the defendant was arraigned on the instant misdemeanor and a felony count; the People moved to dismiss the felony on September 23, 2024. On November 14, 2024, the People sought and received a CPL 245.70 extension of two weeks to disclose FDNY materials; in granting the extension to avoid any potential CPL 245.80 sanctions, this court did not find a basis to exclude any CPL 30.30 time. The People certified compliance with their discovery obligations and announced that they were ready for trial on November 14, 2024. They filed a supplemental COC and restatement of readiness on November 19, 2024.
On November 26, 2024, the court conducted a readiness inquiry (CPL 30.30 [5]) and set the matter down for a discovery compliance conference (CPL 245.35 [2]). Also on November 26, 2024, the People requested and received a second two-week CPL 245.70 extension to produce the FDNY documents, with the court's specific proviso that the time would not be excludable for 30.30 purposes. The People filed a second supplemental COC and restatement of readiness on December 2, 2024. On December 17, 2024, the defense filed an omnibus motion including motions to dismiss. This court conducted the discovery compliance conference in two parts on January 3, 2025, and February 7, 2025. At the conclusion of the conference, this court ruled the People's COCs to be improper and invalid for their failure to act with the requisite due diligence in obtaining and disclosing various automatically discoverable materials, including but not limited to missing FDNY records. Because the February 7, 2025 ruling would certainly draw new motions from both parties, the court adjourned the matter for a decision to settle all pending motions, submissions now exceeding 700 pages.
Since the February 7, 2025 ruling, the People have only disclosed a single seven-page FDNY document, which prompted a third supplemental COC and restatement of readiness filed on April 7, 2025. Additional materials discussed below — which the court explicitly ordered the People to disclose — remain outstanding.
Discovery Standards and the People's Motion
The validity of a COC rests on whether the People's disclosure efforts were made in good faith and with the reasonable due diligence required by the individual circumstances of the case at bar (CPL 245.50; People v Bay, 41 NY3d 200 [2023]). When an objection is raised by the defense, it is this court's practice to make the determination from the bench following a full [*3]inquiry which consists of 1) a review of the parties' detailed joint letter, here including exhibits (CPL 245.35 [1, 4]), and 2) an extensive, on-record discovery compliance conference (CPL 245.35 [2]). When the conference in this matter was concluded, two things were clear: the People had not disclosed all discoverable materials prior to filing their November 14, 2024 COC, and their efforts to obtain and disclose these missing materials fell short of reasonable due diligence (CPL 245.50; Bay, 41 NY3d 200). Crucial to this decision was the court's finding that under these specific circumstances, the FDNY acted in a law enforcement capacity, thereby placing its materials within the People's constructive possession (CPL 245.20 [2]). Because the discovery statute envisions "special circumstances" in which the People might be found ready for trial notwithstanding the lack of a valid COC (CPL 245.50 [3]), this court invited the People to submit papers advancing an argument on this narrow issue.
Rather than moving for special circumstances, the People instead filed a motion in which they reargued the points made on the record at the discovery compliance conference and essentially requested reversal. A proper motion for leave to reargue "shall be specifically identified as such" (CPLR 2221 [d] [1]), and "shall be based upon matters of fact or law allegedly overlooked or misapprehended by the court in determining the prior motion, but shall not include any matters of fact not offered on the prior motion " (CPLR 2221 [d] [2]). This motion has done neither. The People fail to allege a proper ground for a motion to reargue and show no cause for this court to disturb its prior ruling. The court does not entertain this improperly pleaded motion to reargue, but notes that it would in any event be denied on the merits for the reasons detailed below, which memorialize the court's rulings from the bench on January 3, 2025, and February 7, 2025. Further, the People have made no showing of special circumstances which would give this court any reason to find them ready for trial notwithstanding their lack of a valid COC. Finally, the People have not established any exceptional circumstances under CPL 30.30 (4) (g). The People's motion is therefore DENIED. As their COCs are invalid and improper, their statements of readiness are, perforce, the same.
Constructive Possession: The Role of the FDNY
At the outset, it is worth noting that all fire marshals are legally classified as police officers. "In the performance of their duties, the chief fire marshal, deputy chief fire marshals, supervising fire marshals and fire marshals shall have all the powers and perform all the duties of police officers in the state." (Administrative Code of City of NY § 15-117; accord CPL 1.20 [34] [i]; cf. CPL 2.10 [28] [otherwise designating FDNY members as peace officers].)
The People have offered conflicting accounts about how the FDNY came to be involved in this case. In one narrative, FDNY involvement began when Fire Marshal G. "observed a still image of the defendant in a Wanted Flier" [sic] (People's affirmation in support of a protective order dated Nov. 14, 2024, ¶ 6 [appended as exhibit 6 to People's mot dated Feb. 28, 2025]). In another version, Fire Marshal G. "saw the Suspect ICARD of the defendant and ran his own facial recognition search" (People's mot dated Feb. 28, 2025 at 16; accord id., ¶ 7; accord People's undated affirmation in support of a so-ordered subpoena ¶ 4 [appended as exhibit 4 to People's mot dated Feb. 28, 2025]; accord People's mot dated Apr. 11, 2025, ¶ 7).[FN1]
It is undisputed that the NYPD fashioned and disseminated wanted posts via social media and the internet because their own facial recognition software failed to identify a suspect (People's mot [*4]dated Feb. 28, 2025, ¶ 6). Assuming Fire Marshal G.'s actions were in fact undertaken sua sponte, this court recognizes a qualitative difference between an investigation prompted by a public wanted notice (NYPD's public Instagram account "CrimeStoppers"), versus one instigated by an internal alert visible across law enforcement agencies (suspect I-card). However, the subsequent concerted actions of Fire Marshal G. and the NYPD clarify that Fire Marshal G. acted in an official FDNY capacity, which here further rose to the level of law enforcement activity.
Referenced during the discovery compliance conference and appended several times to the instant motions are a series of emails between Fire Marshal G. and NYPD employees (e.g., People's mot dated Feb. 28, 2025, exhibit 4, sub-exhibit 1). On June 3, 2024, at 3:46 p.m., Fire Marshal G. sent an email from his FDNY email account with the subject line "Instagram wanted" to a detective of the NYPD:
Hey brother,
Good speaking with you. Attached find the Instagram post from today Crime stoppers. I ran it through our facial and it came back to this guy who graduated from Ossining High School in 2022. Can't find his name. Maybe they can help with an ID.
Not too sure what that scarf says but maybe related to Palestine?
LMK how you make out.
This email included photographs and screenshots of facial recognition matches. They depict an image of a redhaired youth taken from NYPD CrimeStoppers, matched to a redhaired youth in a graduation cap and gown; the same CrimeStoppers image is also matched to a redhaired youth in a tuxedo with his arm around a young woman in a formal gown that matches his bow tie. One of the screenshots displays the legend "2022 OHS Graduation (oufsd.smugmug.com)." The background visible behind both matches is a blurry, greyed-out grid of photographs depicting multiple redhaired young men and the words, "335 results." Other numbers are present in the left margin of this blurred grey background; in the cap and gown background, the numbers are "220 results," "23 results," and "13 results," while the numbers behind the tuxedo photo are "23 results," "13 results," and "23 results." Neither the screenshots nor the body of the email indicate how Fire Marshal G. chose to focus on this redhaired youth.
Shortly thereafter at 5:20 p.m., the NYPD case detective on this matter sent an email with the subject line "Hate Crime Assault Investigation" to Fire Marshal G.: "Thanks for your help, Im [sic] watching the graduation now."
Within minutes, at 5:49 p.m., Fire Marshal G., again using his FDNY email account, sent that detective three uniform resource locator (URL) links (one to an archive of school play photos, one to Clearview AI [artificial intelligence] face search results, and one to Ossining High senior prom photos on smugmug.com) and wrote, "I can't find any social media for her [sic] other than the smug mug link I included. If you get a name I can get the DL photo for you. We have access to that."[FN2]

The next minute, at 5:50 p.m., the NYPD detective replied with the defendant's name, his date of birth, and his nine-digit "NYS Client ID#," also known as a driver's license number.[FN3]

Four minutes later, Fire Marshal G. sent the one-word unpunctuated reply, "Bingo[.]"
The next email in the chain appended here is sent eleven days later on June 14, 2024, when Fire Marshal G. wrote, "Saw the news. Good work. Glad you grabbed him."
The NYPD detective replied to Fire Marshal G. at 8:48 a.m. on June 15, 2024, "Yea that's to you, I appreciate the help."
Later that day, at 12:07 p.m., Fire Marshal G. answered, "All good bro happy to help. Don't hesitate to reach out again if you need anything."
It is undisputed that the police would not have identified the defendant but for the Clearview AI search and the DMV photo. It is also evident that the investigatory steps described in the emails clearly contravene official NYPD policy concerning the use of facial recognition (New York City Police Department Patrol Guide No. 212-129, available at https://www.nyc.gov/assets/nypd/downloads/pdf/nypd-facial-recognition-patrol-guide.pdf [last accessed May 28, 2025]). When seeking to match the "probe photo" (here, the still photograph the NYPD used for the I-card and the CrimeStoppers flyer), the NYPD does not permit a facial recognition search to extend as widely as it did in this case. Although the FDNY's facial recognition software crawled the web and turned up hundreds of matches from around the world, including Ossining High School, the NYPD was restricted to an approved photo repository, a "controlled and limited group of images against which the probe image is compared." (Id.) The repository has further restrictions:
The photo repository only contains arrest and parole photographs. It is stored in a designated, and approved, law enforcement database, and access is restricted to authorized users. (Id.) Further, "The use of facial recognition technology that compares probe images against images outside the photo repository is prohibited, unless approval is granted for such analysis in a specific case for an articulable reason by the Chief of Detectives or Deputy Commissioner, Intelligence and Counterterrorism." (Id.) Supervisors are mandated to "evaluate and monitor compliance with this procedure by investigators who utilize facial recognition technology." (Id.) The limits imposed by official NYPD policy presumably seek to address well-publicized concerns about the reliability and accuracy of facial recognition technology, as well as oft-raised questions regarding privacy and the disproportionate effect it imposes on people and communities of color. The investigatory steps taken here by Fire Marshal G. were tacitly approved and adopted by the case detective despite being clearly out of accord with NYPD policy.
Because FDNY disclosures remain outstanding, it is wholly unknown to the prosecution — and therefore to this court — whether these emails comprise the entirety of the written FDNY communications about this case. In addition, the contents of the emails establish that Fire Marshal G. spoke at least once on the telephone to at least one NYPD officer regarding this case (see above, email dated June 3, 2024, at 3:46 p.m.). Moreover, the emails are silent as to who initiated that first telephone call, and even suggest that, contrary to the People's assertions, the assistance of Fire Marshal G. may have been solicited by the NYPD (see above, "Don't hesitate to reach out again ..." email from Fire Marshal G. to NYPD detective, June 15, 2024, at 12:07 p.m.).
Nevertheless, even in their incomplete condition, the emails provide abundant indication that the FDNY's own police powers were invoked and utilized in the investigation of the crime charged here. Fire Marshal G. did not act as a private citizen when he used FDNY-owned facial recognition software to identify the suspect. He did not act as a private citizen when he used his official email account to directly email an NYPD detective. Indeed, the NYPD lent his efforts the [*5]credence that would typically be due a fire marshal of the FDNY's bureau of fire investigation, a title statutorily defined as a police officer. He emailed directly, using a salutation that highlighted his kinship and alliance ("Hey brother"); he included his official email signature, displaying his department title and bona fides ("FM [C.G.], Fire Department City of New York, Bureau of Fire Investigations, Office of the Fire Commissioner, ATF [Alcohol, Tobacco and Firearms] Task Force Officer Group 1, HIDTA [High Intensity Drug Trafficking Areas] Liaison"). All of this bears the imprimatur of official investigatory work — far from the credit it may have received had it been called in as an anonymous tip, or indeed from any private citizen whether identified or not. Working together from AI source material unavailable to the NYPD, Fire Marshal G. and the NYPD case detective were able to compile the suspect's name, date of birth, and state identification number. Then Fire Marshal G. went further and did what the NYPD could not: he directly accessed DMV records to pull the suspect's driver's license photo, which he sent to the case detective. The police used that DMV photograph in compiling an array from which the complainant identified the suspect — now defendant. This is bedrock police work, and it was done with privileges available to the FDNY.
This court declines to speculate regarding the mechanism by which Fire Marshal G. accessed the defendant's driver's license. It is undisputed here that he accessed it, and the court record reflects that he did so knowing the information was not readily available to the NYPD detectives working on the case. Moreover, the NYPD detective knew he was obtaining material unavailable to the police without the permission of a court — and he voiced no objection. Indeed, on its website the New York DMV represents to the public that the photographs in its possession are fully private, absent judicial intervention:
The DMV does not release photographs, Social Security Numbers, telephone numbers, medical information, or disability information. This information is not available even to those persons who request the information and have a DPPA [the federal Drivers Privacy Protection Act, 18 USC § 2721 et seq.] permissible use. This information is only obtainable via 'so ordered' subpoena signed by a NY State or federal judge.
(New York State Department of Motor Vehicles, Drivers Privacy Protection Act (DPPA), https://dmv.ny.gov/records/drivers-privacy-protection-act-dppa [last accessed May 27, 2025].) This practice accords with the additional privacy laws afforded to New Yorkers by the Driver's License Access and Privacy Act, also known as the Green Light Law (Vehicle and Traffic Law §§ 201, 502, 508, as amended by L 2019, ch 37). Among its other provisions, the law quite clearly states that DMV photographs are "not a public record" and may only be released a) to the person who is the subject of the photo, b) where necessary to maintain the National Driver Register, or c) "where necessary to comply with a lawful court order, judicial warrant signed by a judge appointed pursuant to article III of the United States constitution, or subpoena for individual records issued pursuant to the criminal procedure law or the civil practice law and rules." (Vehicle and Traffic Law § 201 [8].)
For purposes of the case against this defendant, it is of no moment how or why Fire Marshal G. was able to obtain this seemingly protected photograph; this court is satisfied that such ability rested solely on his role and function as an investigator with the FDNY. Further, this court rules that in this particular exercise of his official powers, Fire Marshal G. acted in a law enforcement capacity when he initiated an active role in the investigation of this case and performed investigatory work outside the NYPD's immediate reach. As demonstrated by their email communications, his efforts were gratefully accepted and relied upon by the NYPD and became an integral part of the initial investigation of this case. As such, the automatically discoverable information and materials related to Fire Marshal G.'s law enforcement actions are, by operation of law, deemed to be in the People's constructive possession (CPL 245.20 [2]).
The People's Efforts to Disclose Discoverable Materials
FDNY Records
There is no doubt that the People made efforts to acquire the FDNY records related to the instant case. In analyzing whether those efforts were sufficient, this court took account of the [*6]instructive list of factors set forth by the Court of Appeals in Bay (41 NY3d at 212). This case now alleges only a misdemeanor and rests entirely on the complainant's identification of the defendant. Per the record before this court, there is no additional evidence connecting the defendant to the alleged incident — no surveillance video to and from his home, no independent identification by others in attendance. The parties were not then and are not now known to each other. This case is premised on the complainant's word that he was the target of criminal actions by another person, and that other person was the defendant. The importance of the complainant's credibility is paramount, and any defense attorney might stake a potential defense on irregular actions taken by law enforcement officials in facilitating an identification. As such, the FDNY records in question are far from ancillary — they go to the substantive merits of the state's case. Additionally, the discovery disclosed to date cannot be described as exceptionally voluminous, and there is no reason to believe that the People were overwhelmed by identifying potential sources of relevant information. For these reasons, the court was first and particularly struck by the significant delay in the People's initial attempts to acquire these records.
To begin, "sufficient communication for compliance" is the responsibility of the prosecution; the "flow of information" between law enforcement and the prosecution falls to the People (CPL 245.55). In furtherance of that duty, the statute gives the People the legal right to acquire the entire law enforcement file simply by asking.[FN4]
Here, where the NYPD knew from the outset that FDNY involvement played an integral part in their investigation, an adequate flow of information would have ensured that at an early stage in their prosecution, the People had the same knowledge. Yet, from the record before this court, it was the defense who prompted the People to inquire further of the case detective; only then was the FDNY's role brought to light.
The People explicitly acknowledged that until conferring with defense counsel, they had not "realized that there was going to be outstanding discovery from FDNY." (Feb. 7, 2025 tr at 31, lines 12-14 [appended as exhibit B to defendant's mot dated Mar. 21, 2025].) Defense counsel's prompting came late in this prosecution not because of any orchestrated delay but because the People made their first disclosures on October 17, 2024, 126 days after the defendant's arraignment, long after the initial 35-day schedule set forth in CPL 245.10 (1) (a) (ii) and its permissible 30-day extension (CPL 245.10 [1] [a]). When, on October 22, 2024, and again on October 28, 2024, the People obtained emails between the NYPD and Fire Marshal G., they were emails that had always been in the case detective's immediate possession (People's mot dated Feb. 28, 2025, exhibit 4, sub-exhibit 1). It is hard to believe that this level of FDNY involvement did not seem worth mentioning or was accidentally excluded from the NYPD's investigative case file. But this is what makes the People's affirmative obligation to ascertain the existence of discoverable material so important. Even a cursory inquiry about the identification procedure and the use of facial recognition software to compile the photo array certainly would have led the People to these email communications long before the 126th day.
Although late in time, the People's immediate steps once the emails were disclosed must be acknowledged: the assigned assistant called Fire Marshal G. directly, left a voicemail and sent an email (id., exhibit 2). Two days later, he sent a subpoena to the FDNY via email and copied Fire Marshal G., again asking him to telephone him (id., exhibit 3). On November 7, 2024, he spoke to a different fire marshal, learning that Fire Marshal G. was out on indefinite leave, and was told he would need a so-ordered subpoena (People's undated affirmation in support of a so-[*7]ordered subpoena ¶ 6 [appended as exhibit 4 to People's mot dated Feb. 28, 2025]). He obtained from this court a so-ordered subpoena, identical to the one the People had previously issued, which demanded production of "any and all documentation, correspondence, reports, etc.," with specific reference to "Facial Identification Section (FIS) reports" and "emails, correspondence, notes, memos, etc.," by November 14, 2024 (People's mot dated Feb. 28, 2025, exhibit 5). The assigned again emailed it to the FDNY's "court intake desk" email address (id.). On November 14, 2024, knowing they had not yet received the records or even word on when the subpoenaed records would arrive, the People certified compliance. By then, 154 days had elapsed since the defendant's arraignment, and these law enforcement materials remained undisclosed.
After the People's statement of readiness, their efforts dwindled. When probed by this court during multiple appearances, the People indicated they had re-forwarded the so-ordered subpoena to the same FDNY email (November 18, 2024); called "someone" at the FDNY (November 25, 2024); and reached another unnamed FDNY representative sometime in December, yielding no information on when the materials would be sent. On January 3, 2025, after finding the FDNY materials automatically discoverable and in the constructive possession of the People, the court suggested that an order to compel may be necessary given that the FDNY had not complied with the so-ordered subpoena it received over six weeks prior. The court further instructed that, prior to the next court date, the People had to specifically inquire of their FDNY contact when the subpoenaed materials would be sent. The court made clear that on that court date the People should, at a minimum, be able to provide the name of the FDNY contact with whom the assigned was communicating. (Jan. 3, 2025 tr at 18-23; at 50, line 23, through 51, line 1 [appended as exhibit 12 to People's mot dated Apr. 11, 2025].)
On February 7, 2025, the assigned offered the following update: on January 15, 2025, he spoke with a specific, named person from the FDNY "court intake desk," who reported that a staffing shortage prevented the FDNY from timely responding to the hundreds of subpoenas they receive a week. The People were not able to tell this court whether that figure pertained to so-ordered subpoenas, nor whether the staff who handled the subpoenas were lawyers. The assigned admitted he had not contacted the FDNY's attorneys or otherwise escalated his inquiry within the FDNY or his own office; when asked why, he said his office's guidance is to reach out only to the "court intake desk" as the "sole contact" for subpoena compliance. (Feb. 7, 2025 tr at 4, line 23, through 7, line 1 [appended as exhibit B to defendant's mot dated Mar. 21, 2025].) Nor could he say, upon pointed questioning from this court, whether the People might move to compel the FDNY to comply with the so-ordered subpoena; he said he would have to speak with supervisors in his office before determining whether to take that step (id. at 9, lines 6-8). Of note, the People made this record 87 days after moving this court for the so-ordered subpoena, and 239 days into the prosecution, signaling a wholly unreasonable response from both the FDNY and the prosecution given the applicable speedy trial clock. The People's plan appeared to be that they would occasionally and indefinitely reach out to the same unresponsive court desk in the hope that one day the court would receive the so-ordered materials.
Finally, on April 7, 2025, nearly a year after the alleged incident, the FDNY made its only response to the so-ordered subpoena, which had been issued nearly five months earlier. A scanty seven-page document showing 24 photos that match the probe image taken from the CrimeStoppers flyer, it consists of a Clearview AI report prepared November 7, 2024, documenting the "Face Search Results" of the original search created by Fire Marshal G. on June 3, 2024. There is no information about how these 24 were selected from the hundreds apparently indicated in other discovery. Further, it is wholly impossible for this court to believe the People considered this return fully responsive to the subpoena they caused to be issued, which demanded production of "emails, correspondence, notes, memos, reports, etc.," and "any and all documentation, correspondence, reports, etc.," related to this defendant. Despite the manifest insufficiency of this return, as indicated previously, the People have to date sought no further enforcement of their subpoenas. (See e.g. CPLR 2308 [outlining contempt procedures available for disobedience of judicial subpoena].)
In sum, accounting for the People's efforts, this court is flummoxed by the many reasonable efforts the People did not make: they did not remotely comply with the statutory timeframes in which to complete disclosure; they did not review their own disclosures closely enough to have noticed fire department involvement immediately gleaned by defense counsel; they did not get names and titles of individuals to whom they spoke regarding the so-ordered subpoena; they did not contact those individual's supervisors; they did not contact any FDNY attorneys; they did not seek internal approval to move for an order to compel FDNY subpoena compliance — even after this court not only ruled the materials discoverable and in their constructive possession, but very strongly suggested that the materials were unlikely to be obtained absent an order to compel.
Although the People argue that their having caused two subpoenas to be served on the FDNY is evidence of their due diligence, it strikes this court as quite the opposite. The People sought no legal enforcement of these subpoenas and could not indicate any intention to do so. There are certainly occasions when a so-ordered subpoena might be rendered moot — the parties agree to a disposition, or the People move to dismiss the matter based on other grounds. But such is not the case here. The People have indicated their willingness to proceed to trial without ever moving to compel compliance and without ever acquiring these records. Moreover, although this court ordered the People in January and again in February to ascertain and disclose any disciplinary materials for Fire Marshal G. — given his amplified and potentially untoward work on this case — they provide no indication in their April 7, 2025 supplemental COC that such request was made by subpoena or otherwise. Lastly, this court cannot now or ever adopt the practice of issuing so-ordered subpoenas at the request of a party who, in the end, demonstrates a limited desire to actually acquire the materials demanded. In this case, an observer could be forgiven for questioning whether the People sought this discovery in sincerity or merely used the so-ordered subpoena as a superficial showing of diligence.
At a minimum, having considered all the circumstances related to the FDNY materials and the People's efforts to obtain and disclose them, this court cannot hold that the People acted reasonably or with the required diligence.
Materials Related to the Alteration of Defendant's Photo
The NYPD digitally altered the defendant's DMV photograph and placed it in a photo array, resulting in his identification. Copies of the original and altered photographs, as disclosed to the defense, demonstrate that the length of his neck had been modified prior to being shown in the identification array. The People could not sufficiently explain why the length of his neck was altered for the photo array. They never sought the metadata which would clearly indicate how, when, and perhaps by whom the photo was doctored. Nor did they seek other related materials, such as notes, emails, or any communications attendant to the manipulation. This information is in the People's constructive possession, and it is automatically discoverable. Despite this court's explicit February 7, 2025 order to disclose the metadata and any other information pertaining to the NYPD's digital alteration of the defendant's appearance in his DMV photograph, this discovery remains outstanding.
Disciplinary Records for Testifying Police Officers
The People initially disclosed improperly redacted disciplinary records for testifying police officers. Having never seen unredacted versions, the People could express no good faith basis for their assertion that the redacted material was unrelated to the subject matter of the case (CPL 245.10 [1]). Instead of seeking the materials and applying to the court for a protective order as mandated by statute (CPL 245.10 [1], 245.70 [1]), they requested unredacted versions from the NYPD only upon this court's January 3, 2025 order. Unredacted copies were shared with the defense 239 days after arraignment.
Medical Records
Unlike the other categories of discovery at issue here, the complainant's medical records are not in the constructive possession of the People; however, because they are automatically discoverable, the People are required to make diligent efforts to ascertain their existence and [*8]make them available to the defense (CPL 245.20 [2]). The People first sought the complainant's medical records connected to the charged incident via subpoena 127 days after arraignment, on October 18, 2024. An incorrect HIPAA form prevented their release. The People re-submitted with a corrected HIPAA on December 23, 2024, and finally disclosed them to the defense over 200 days after arraignment. Treatment records arising from the charged incident are plainly related to the subject matter of the case, and therefore automatically discoverable. But in this instance, the complainant's medical records were especially germane. Notwithstanding their assertions that the prosecution did not require the records for its own trial readiness, here the People knew the records to be of particular utility to the defense. This distinction strikes the court as the very purpose of the discovery statute — to promote fairness and openness in the early stages of a criminal prosecution, rather than continuing the antiquated practice of providing information and materials on the eve of trial, or never.
Here, it is an uncontested matter of record that the complainant told the prosecution in May 2024 that he had sought medical care in the aftermath of the incident, and that he was not sure whether his facial laceration was from being hit with a hard object — as he swore to in his supporting deposition — or from acne. (Parties' joint letter at 11 [appended as exhibit 11 to People's mot dated Apr. 11, 2025].) That statement alone renders these medical records discoverable as possible impeachment material, necessitating their disclosure pursuant to CPL 245.20 (1) (k). Yet the People, despite voluminous written submissions and pointed questioning by this court (Jan. 3, 2025 tr at 36, line 25, through 41, line 6 [appended as exhibit 12 to People's mot dated Apr. 11, 2025]), have articulated no efforts to obtain these records prior to October 2024. The court reminds the People that they are not constrained to seeking such records via subpoena and accompanying HIPAA; cooperating complainants can obtain their own medical records at the touch of a button via health care provider portals. This provider's portal is located at https://www.swellbox.com/citymd-wizard.html (last visited June 6, 2025). Records obtained in this fashion would suffice for discovery purposes; certification or authentication are evidentiary issues at trial.
Given the above, and the full record made by this court at the conclusion of the discovery compliance conference, this court found then and would find again today that the People acted neither reasonably nor diligently with respect to the disclosure of this automatically discoverable material. Each category detailed above provides sufficient independent basis to hold the People's COCs improper and invalid. Collectively they do the same. Because no basis has been established for special circumstances which would permit this court to find the People ready for trial in the absence of a valid COC, the People's on- and off-record statements of readiness are invalid.
CPL 30.30 and 170.30
Here, although the case has been reduced to a misdemeanor, the felony speedy trial period of six months (CPL 30.30 [1] [a]) still applies. The timing of the reduction in this case dictates that "the period applicable to the charges in the felony complaint must remain applicable" because "the aggregate" of the misdemeanor clock plus the chargeable time "already elapsed from the date of the filing of the felony complaint ... exceeds six months" (CPL 30.30 [7] [a]). Here, the case commenced on June 13, 2024, and was reduced to a misdemeanor on September 23, 2024, the 102nd chargeable day. A 90-day period applies to the remaining misdemeanor charge; adding the two periods results in an aggregate of 192 days, a period that exceeds the six months measurable from the June 13, 2024 commencement of the case (i.e., to December 13, 2024, or 183 days). Although a criminal action commences with the filing of an accusatory instrument, computation for speedy trial purposes commences on the next day (People v Stiles, 70 NY2d 765 [1987]). 
In determining whether the People have satisfied their obligation to be ready for trial under CPL 30.30, the court must calculate the time between the filing of the first accusatory instrument and the People's declaration of readiness, then subtract any statutorily excludable periods of delay, and finally add any periods of post-readiness delay that are attributable to the [*9]People for which no statutory exclusions apply (People v Cortes, 80 NY2d 201 [1992]).
Additionally, the People cannot be deemed ready for trial until a proper COC is filed with the court and served upon the defense. "Any statement of trial readiness must be accompanied or preceded by a certification of good faith compliance with the disclosure requirements of section 245.20 . . . ." (CPL 30.30 [5]). "[A]bsent an individualized finding of special circumstances in the instant case by the court before which the charge is pending, the prosecution shall not be deemed ready for trial for the purposes of section 30.30 until it has filed a proper certificate " (CPL 245.50 [3]).
On June 13, 2024, the defendant was arrested on an open complaint, the People filed the accusatory instrument, and he was arraigned. The time period pursuant to CPL 30.30 runs from "the commencement of a criminal action" (CPL 30.30 [1] [a]). This criminal action "commenced" when the first accusatory instrument was filed (CPL 1.20 [17]; People v Stirrup, 91 NY2d 434, 438 [1998]). The arraignment court adjourned the case to August 6, 2024. The People are charged with 54 days.
On August 6, 2024, the People were not ready and stated that they were reviewing evidence submitted by the defense. The court adjourned the case to September 23, 2024, for grand jury action. The People are charged with 48 days.
On September 23, 2024, the People were not ready and moved to dismiss the felony count. The court adjourned to November 14, 2024, for supporting deposition. Off calendar on October 17, 2024, the People filed and served a supporting deposition. The People are charged with 52 days.
On November 14, 2024, this court deemed the complaint an information (CPL 170.65 [1]). The People stated they were ready but for outstanding FDNY materials and made an application to extend discovery time pursuant to CPL 245.70. The court granted the extension and specified that it was not a CPL 30.30 continuance. The case was adjourned to January 3, 2025, for trial. Off calendar on November 14, 2024, the People filed their COC, COR, and an Automatic Discovery Form (ADF). For the reasons articulated above, the People's COC and COR were invalid and improper and therefore failed to toll the speedy trial clock. Off calendar on November 19, 2024, the People filed a supplemental COC and restatement of readiness, with the same result. The matter was advanced to November 26, 2024. The People are charged with 12 days.
On November 26, 2024, the matter was advanced to address the People's request for an additional extension of time to produce FDNY records pursuant to CPL 245.70. This court granted another two-week extension of CPL 245.10 requirements only, and explicitly did not find a CPL 30.30 exclusion. The People stated ready. Upon conducting the requisite CPL 30.30 (5) inquiry, the court ordered the parties to continue conferring and to submit a joint letter to the court by December 20, 2024, memorializing the points on which they required adjudication. The court adjourned to January 3, 2025, for a discovery compliance conference. Off calendar on December 2, 2024, the People filed and served a supplemental COC and restatement of readiness, which for the same reasons again failed to toll the speedy trial clock. Off calendar on December 17, 2024, the defendant filed an omnibus motion including motions to dismiss; the motion tolled the speedy trial clock, which given the procedural history of this particular case — including extensive prior conferral initiated by the defense, as well as insufficient prosecutorial response — this court would otherwise have tolled beginning December 20, 2024, with the submission deadline for the joint letter (CPL 30.30 [4] [a]). The People are charged with 21 days.
On January 3, 2025, this court held the discovery compliance conference, which needed to be conducted in two parts. The court adjourned the second part to January 16, 2025, but due to the assigned's illness on that day, adjourned again to February 7, 2025. This period is excludable due to motions pending before the court (CPL 30.30 [4] [a]).
On February 7, 2025, upon concluding the discovery compliance conference, this court [*10]ruled the People's COC invalid and improper, and their COR therefore invalid. The court set a motion schedule for the parties to move under CPL 245.50 (3) and CPL 30.30, and adjourned to May 2, 2025, for decision. For a variety of reasons involving both parties and the court itself, the decision date was administratively adjourned several times, ultimately to June 17, 2025. Off calendar on April 7, 2025, the People filed and served a supplemental COC and restatement of readiness reflecting the disclosure of a brief portion of the FDNY materials requested by subpoena. Because several categories of automatic discovery remain outstanding, with no further explanation from the People, this COC is also improper and invalid. This period is excludable due to motions pending before the court (CPL 30.30 [4] [a]).
Based on the foregoing, the People are charged with 187 days of delay, which is beyond the period permitted under CPL 30.30 (1) (a) and (7) (c), here calculated as 183 days.
Accordingly, the defendant's motion to dismiss the accusatory instrument pursuant to Criminal Procedure Law §§ 30.30 and 170.30 (1) (e) is GRANTEDand his other motions are therefore moot.
The foregoing constitutes the opinion, decision, and order of the court.
DATED: June 17, 2025
New York, New York
Valentina M. Morales, A.J.S.C.

Footnotes

Footnote 1: "An I-card is an internal NYPD form issued by an officer when there is a suspect, witness, or perpetrator to be investigated." (Johnson v City of New York, 2017 WL 1476139 [ED NY, Apr. 24, 2017, No. 15CV1625 (SMG)].) Elsewhere it is defined as "[a]n investigation card used by members of the New York City Police Department to alert other members of probable cause to arrest a subject." (People v Jones, 24 Misc 3d 1229[A], 2009 NY Slip Op 51669[U] [Sup Ct, Kings County 2009].)

Footnote 2: As shown by later events, Fire Marshal G. was offering to obtain the defendant's driver's license photo from the Department of Motor Vehicles, information not available to the NYPD without a warrant or subpoena.

Footnote 3: According to information on the DMV's public website, the Client ID number is the number the DMV uses to identify individuals holding driver's licenses, permits, or non-driver identification cards. (See, e.g., New York State Department of Motor Vehicles, Where to Find Your Client ID on Your Learner Permit, https://dmv.ny.gov/transaction-message/where-to-find-your-client-id-on-your-learner-permit [last accessed May 28, 2025]; New York State Department of Motor Vehicles, Get My Own Driving Record [Abstract], https://dmv.ny.gov/records/get-my-own-driving-record-abstract [last accessed May 28, 2025].)

Footnote 4: "Absent a court order or a requirement that defense counsel obtain a security clearance mandated by law or authorized government regulation, upon request by the prosecution, each New York state and local law enforcement agency shall make available to the prosecution a complete copy of its complete records and files related to the investigation of the case or the prosecution of the defendant for compliance with this article." (CPL 245.55 [2].)